# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Martin C. Ashman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 7093 | **DATE** | 8/21/2003 |
| **CASE TITLE** | Lisa Ellis, et al. vs. Elgin Riverboat Resort, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter memorandum opinion and order. Defendants' motion to decertify the class [81-1] is granted. Defendants' motion to amend the class definition [80-1] to include only those applicants who auditioned is denied as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | 2 number of notices | | Document Number |
| | No notices required. | | | | | |
| ✓ | Notices mailed by judge's staff. | | | AUG 2 2 2003 date docketed | | 98 |
| | Notified counsel by telephone. | | | | | |
| | Docketing to mail notices. | | | docketing deputy initials | | |
| | Mail AO 450 form. | | | 8/21/2003 date mailed notice | | |
| | Copy to judge/magistrate judge. | | | | | |
| | IS | courtroom deputy's initials | | IS mailing deputy initials | | |

03 AUG 21 PM 3:36
CLERK
U.S. DISTRICT COURT
ED-7
FOR DOCKETING
Date/time received in central Clerk's Office

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| LISA ELLIS, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 98 C 7093 |
| | ) | |
| v. | ) | Magistrate Judge |
| | ) | Martin C. Ashman |
| ELGIN RIVERBOAT RESORT, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**DOCKETED**

AUG 2 2 2003

## MEMORANDUM OPINION AND ORDER

### I.  Introduction

Plaintiffs, Lisa Ellis, Marcia English, Yvonne Mason and Derrick Denson (collectively

referred to as "Ellis" or "Plaintiffs"), filed a putative class action suit alleging that the defendants,

Elgin Riverboat Resort d/b/a Grand Victoria Riverboat, Nevada Landing Partnership, and RBG,

Ltd. (collectively referred to as "Elgin") engaged in a pattern and practice of discriminatory

hiring based on race, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42

U.S.C. §2000e.  For relief, Ellis requested both declaratory and injunctive relief, as well as back

pay and benefits for the named plaintiffs.  On March 27, 2000, Judge Gottschall certified the

class pursuant to Federal Rule of Civil Procedure 23(b)(2).  Presently before this Court is Elgin's

motion to decertify the class or to limit the scope of the class to those applicants whom Grand

Victoria invited to audition for a dealer position.[1]

---

[1] The parties have consented to have this Court conduct any and all proceedings in this
case, including the entry of final judgment.  See 28 U.S.C. §636(c); Local R. 73.1(b).

## II. Background

Grand Victoria is a state-licensed gambling facility located in Elgin, Illinois. It employs approximately four hundred dealers, all of whom deal at least one of the following games: craps, blackjack and roulette, as well as games such as baccarat and Caribbean stud poker. Prospective dealers may apply to the casino in a number of ways: after retrieving a written application from the Human Resources Department or from an adjacent building (until November 2002), applicants may return the application to a Human Resources clerk, drop the application in a designated drop box on the boat or in the accounting hallway, or return the application by mail. (McGill Aff. ¶ 4.) Beginning in July 2001, applicants could complete the application online. (Id.).[2]

When a Human Resources clerk receives a written application directly from an applicant, the clerk completes a Pre-Employment Screening Tool, which asks for the applicant's name, whether the applicant has previously applied to or been employed at the Grand Victoria and if so, the date of such application or employment. The Screening Tool further requires clerks to rate, on a scale of 1-5, their impression of the applicant on whether the applicant seems friendly, helpful, courteous, eager to please, and whether the applicant presents a neat and clean appearance.

---

[2] The plaintiffs contend that Elgin requires all applicants to apply in person. (Pls.' Opp'n Mem. at 11.) However, the deposition pages the plaintiffs reference do not specifically support the assertion. Both Penson's and McGill's deposition excerpts explain what the Human Resources clerks do *when* an individual applies in person, but are silent about whether an applicant may only apply in person.

Thereafter, clerks process the applications and forward them to a Human Resources manager for initial screening.[3] Over the course of the class period three assistant managers have been responsible for screening, each of whom determined whether the application was complete, reviewed the applicant's job history including prior employment with Grand Victoria, and looked for large unexplained gaps in the applicant's employment history. Beyond these characteristics, individual screeners focused on different aspects of the application when evaluating the applicant: Lennor Penson focused on applicants' previous employment and eligibility for rehire, while Zaara Norten focused on applicants' record of job stability. If the Human Resources manager approves the application, the department holds the application until the Casino Manager or one of his staff notifies Human Resources that the casino has openings for the dealer position. When such dealer positions become available, Casino Manager Michael Graninger further screens applications to determine which applicants he will invite to audition. Graninger, a native of Washington, D.C., reviews the second page of the application to assess the applicant's level of dealing experience and job stability. Graninger often reviewed applications with Julian Thompson, employed during the class period first as the Pit Boss and later as Shift Manager. If the applicant included on the application the name of a friend or relative who worked at Grand Victoria and referred him or her to the casino, Thompson often asked the employee whether the applicant was a skilled dealer. The referral was also important to the employee, because under the "Bring a Friend" program the referring employee received a $250 bonus for referring an applicant whom the casino hired and who remained employed for at least six months.

---

[3] Human Resources Manager Sharon McGill has almost always delegated screening to an assistant manager.

Graninger instructed Shift Managers and, occasionally, Pit Managers to invite those applicants who survived the second level of screening to audition for a dealer position. During the class period five shift managers and at least two Pit Managers have conducted dealer auditions and independently determined which applicants pass. The decisonmakers base their decisions on the applicant's 1) knowledge of the game, procedures and payoffs; 2) neatness and accuracy in shuffling and dealing; 3) full awareness of all players at the gaming table; and 4) ability to interact well with the customers.[4] If the applicant passes the audition, he or she will be hired pending a drug test and a criminal background check.

On July 12, 1998, Plaintiffs Lisa Ellis and Marcia English applied in person for dealer positions at the Grand Victoria. Ellis worked for Grand Victoria twice previously, once for a period of several months in 1994 and 1995, and again for one week in December 1995. Shortly after applying, Ellis received notice that Grand Victoria rejected her application and would keep her application on file for thirty days. On August 11, 1998, Ellis spoke with Pit Boss Kevin Schmieder, who advised her that dealer positions were available and suggested that she attend the dealer auditions the following day. He instructed Ellis to inform Julian Thompson that Schmieder told her to audition despite her initial rejection.

Within a few days of applying, English received an invitation from Thompson to audition at the casino. English informed Thompson that she worked as a full-time Chicago public school

---

[4] Plaintiffs claim that Defendants did not have standards for dealers, and that dealers were required only to "know the layout and smile." (Pls.' Opp'n Mem. at 9.) However, Ms. Ellis' deposition confirms that dealers were required to know the game and interact well with customers. (Ellis Dep. at 46.)

teacher and therefore requested only part-time employment. Thompson told her that was okay and instructed her to audition anyway.

On August 12, 1998, Ellis and English arrived with Plaintiff Yvonne Mason to audition for dealer positions. Mason had not yet submitted a written application, but knew Thompson and hoped that he would permit her to audition that day. Mason filled out an application and Thompson informed her that, according to Grand Victoria's rules, she could not audition on the same day she applied for employment, but that she could audition the following week. Thompson also informed Ellis that because she was not invited to the audition he would audition her last. Ellis and English auditioned with a group of four Caucasian women, one Caucasian man, and one Asian woman. The first group of auditions lasted between forty-five minutes and one hour while the second group of auditions (of which English and Ellis were a part) lasted only a few minutes, ostensibly because the casino personnel needed to board the boat.[5] Grand Victoria did not hire Ellis, English or Mason.

On or about November 15, 1998, Derrick Denson submitted an application and resume to a clerk in Grand Victoria's Human Resources department. Grand Victoria did not invite Denson to audition for a dealer position.

On November 6, 1998, Plaintiffs filed a complaint alleging that Elgin Riverboat Resort d/b/a Grand Victoria Riverboat, Nevada Landing Partnership, and RBG, Ltd. engaged in a pattern or practice of hiring discrimination based on race, in violation of Title VII of the Civil Rights

---

[5] One additional applicant, an Asian woman, auditioned with the second group.

Act.[6] The plaintiffs sought class certification under Rule 23 of the Federal Rules of Civil Procedure. Judge Gottschall certified as a class "those African-Americans who were qualified for employment as 'dealers' and applied for work as 'dealers' at the Grand Victoria casino, but were not hired from December 25, 1997 to the present." However, because class size is often speculative during the early stages of litigation, Judge Gottschall certified the class on the express condition that the plaintiffs be able to satisfy Rule 23(a)'s numerosity requirement. (Order granting class certification at 7.) Finding that Plaintiffs satisfied the remainder of Rule 23(a)'s requirements, Judge Gottschall certified the class under Rule 23(b)(2). (Id. at 10.)

On February 7, 2003, after nearly three years of discovery, Defendants filed a Motion to Decertify or, in the Alternative, Modify the Class.[7] During discovery, Plaintiffs identified sixty class members (including the named plaintiffs) and both parties took numerous depositions of class members and Elgin employees, and propounded interrogatories.

### III. Discussion

#### A. Standard of Review

In deciding a motion to decertify a class, the court tests whether economy favors adjudicating multiple disputes in a single action, without sacrificing fairness. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 155 (1982) (quoting *Califano v. Yamasaki*, 442 U.S. 682,

---

[6] Plaintiffs filed an Amended Complaint on July 7, 1999, following Yvonne Mason's death. The Amended Complaint added Denson as a named plaintiff.

[7] On February 18, 2003, Elgin filed a Revised Memorandum of Law in Support of Motion to Decertify the Class.

700-01 (1979)).  To proceed as a class action the plaintiffs must first establish: (1) that members of the class are "so numerous that joinder of all members is impracticable;" (2) that "there are questions of law or fact common to the class;" (3) that the claims or defenses of the class representative are "typical of the claims or defenses of the class;" and (4) that the class representative "will fairly and adequately protect the interests of the class."  Fed. R. Civ. P. 23(a).[8]  Further, the class representative must satisfy a provision of Rule 23(b).  *Rosario v. Livaditis*, 963 F.2d 1013, 1017 (7th Cir. 1992); *Patrykus v. Gomilla*, 121 F.R.D. 357, 360 (N.D. Ill. 1988).[9]  Failure to satisfy any of these requirements precludes class certification.  *Harriston v. Chi. Tribune Co.*, 992 F.2d 697, 703 (7th Cir. 1993) (quoting *Valentino v. Howlett*, 528 F.2d 975, 978 (7th Cir. 1976)).  The court enjoys "broad discretion" in determining whether the plaintiffs have satisfied their burden.  *Keele v. Wexler*, 149 F.3d 589, 592 (7th Cir. 1998) (citing *Mira v. Nuclear Measurements Corp.*, 107 F.3d 466, 474 (7th Cir. 1997)).

Initially, a court determining whether to certify a class must generally accept as true the allegations in support of certification rather than examine the merits of the case.  *Retired Chi. Police Ass'n v. City of Chicago*, 7 F.3d 584, 598 (7th Cir. 1993) ("*Retired Police Ass'n I*").  However, because "the class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action," the court must sometimes "probe behind the pleadings before coming to rest on the certification question."

---

[8] These elements are otherwise referred to as numerosity, commonality, typicality, and adequacy of representation.

[9] Judge Gottschall certified the class under 23(b)(2), which requires that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole . . . ."  Fed. R. Civ. P. 23(b)(2).

*Falcon*, 457 U.S. at 160 (quotations omitted). Because the court must decide whether to certify a class early in the proceedings[10], it remains under a continuing obligation to review whether proceeding as a class action is appropriate, and may modify the class or vacate class certification pursuant to evidentiary developments arising during the course of litigation. *Eggleston v. Chi. Journeymen Plumbers' Local Union No. 130*, 657 F.2d 890, 896 (7th Cir. 1981); *Binion v. Metro. Pier & Exposition Auth.*, 163 F.R.D. 517, 520 (N.D. Ill. 1995) (citing *Falcon*, 457 U.S. at 160) (explaining that the court "remains free" to modify or vacate certification if developments in class litigation so require). Thus, the court's initial certification of a class "is inherently tentative." *Coopers & Lybrand v. Livesay*, 437 U.S. 463, 469 n.11 (1978). *See also Stastny v. S. Bell Tel. & Tel. Co.*, 628 F.2d 267, 275-76 (4th Cir. 1980) (explaining that pretrial litigation may reveal that a plaintiff cannot satisfy commonality factors, requiring the court to decertify the class); *In re Gen. Motors Corp.*, 55 F.3d 768, 792 n.14 (3d Cir. 1995) (noting that all class actions are necessarily "conditional" because under Fed. R. Civ. P. 23(c)(1) courts may modify or decertify a class until final judgment on the merits). The party seeking class certification bears the burden of demonstrating that initial certification is appropriate, *Retired Police Ass'n I*, 7 F.3d at 596, and likewise on a motion to decertify the class, bears the burden of producing a record demonstrating the continued propriety of maintaining the class action, *Stastny*, 628 F.2d at 277.

Ellis characterizes Elgin's motion to decertify the class or to limit the class as a motion to reconsider Judge Gottschall's class certification, which Ellis argues was conditional only with respect to numerosity. Relying on *Gary v. Sheahan*, 188 F.3d 891 (7th Cir. 1999) and on *Best v.*

---

[10] Fed. R. Civ. P. 23(c)(1) requires the court to rule on class certification as soon as practicable after the complaint is filed.

*Shell Oil Co.*, 107 F.3d 544 (7th Cir. 1997), Ellis asserts that this Court is bound by the law of

the case doctrine and may only decertify the class if presented with new law or clear error.

However, Ellis' reliance on *Gary* and *Best*, and on the law of the case doctrine, is misplaced.

First, *Gary* is distinguishable because the *Gary* court faced a completely different procedural

posture: the court did not face a motion to decertify a class but a defendant's attempted

interlocutory appeal of the district court's denial of its motion to decertify the class. *Gary*, 188

F.3d at 893. Ellis therefore takes out of context the *Gary* court's labeling as a motion to

reconsider the defendant's motion to decertify the class. The Seventh Circuit treated the two

motions as one and the same to stress that despite the label chosen by a party, Rule 23(f)'s

prescribed ten-day filing limit on interlocutory appeals still applies.

Second, Elgin's motion is not a motion to reconsider requiring a heightened standard of

review under the law of the case doctrine, but is instead a motion to decertify based on evidence

developed and revelations produced during three years of discovery and pretrial litigation. *See*

*Williams v. Comm'r of Internal Revenue*, 1 F.3d 502, 503 (7th Cir. 1993) ("[T]he second judge

may alter previous rulings if new information convinces him that they are incorrect, but he is not

free to do so . . . merely because he has a different view of the law or facts from the first judge.")

As previously discussed, class certification, modification, and decertification are discretionary.

Rule 23 clearly requires this Court to review the propriety of class certification in light of new

evidence and pretrial litigation, regardless of which judge initially certified the class. *See, e.g.*

*Toney v. Rosewood Care Center, Inc.*, No. 98 C 693, 2001 WL 322413, at *1-3 (N.D. Ill.

Mar. 13, 2001) (on a motion to decertify the class, the court analyzed the defendant's arguments

and did not employ a heightened standard in reviewing the propriety of maintaining a class which

had been previously certified by a different judge).

Finally, assuming the law of the case doctrine did apply, this Court's review of the defendant's motion is appropriate. The law of the case doctrine requires the court to adhere to previous rulings absent a compelling reason, "such as an intervening change of law or *newly discovered evidence*, to examine them." *Smithkline Beecham Corp. v. Apotex Corp.*, 247 F. Supp. 2d 1011, 1014 (N.D. Ill. 2003) (emphasis added). Given the intervening three years of discovery between Judge Gottschall's initial class certification and the instant motion, the parties present this Court with new evidence, i.e., information regarding the proposed class members, and information gleaned from depositions and affidavits, requiring review to determine if the class certification remains appropriate.

**B.  Title VII**

Just as Ellis bears the burden of satisfying the requirements of Rule 23(a), Ellis also bears the initial burden to establish a violation of Title VII. *See Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 336 (1977). The plaintiffs allege that Grand Victoria engaged in a pattern or practice of discriminatory hiring. To establish their Title VII claim, Plaintiffs may proceed under either a disparate treatment or a disparate impact theory. *Id.* at 335 n.15.[11] "To establish a pattern or practice claim [under a disparate treatment theory], the plaintiffs must prove that intentionally discriminatory practices were the defendant's 'standard operating procedure,' not

---

[11] Individual plaintiffs alleging a Title VII violation and proceeding under a disparate treatment theory may offer either direct evidence of intentional discrimination or may proceed under the burden-shifting analysis established by the Supreme Court in *McDonnell-Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). *Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989).

merely sporadic or isolated occurrences." *Taylor v. D.C. Water & Sewer Auth.*, 205 F.R.D. 43, 46 (D.D.C. 2002) (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 336). To do so, Plaintiffs may either offer direct evidence of intentional discrimination, or may offer evidence of a combination of circumstances from which a court or jury may infer discriminatory intent. *See Randle v. LaSalle Telecomms., Inc.*, 876 F.2d 563, 569 (7th Cir. 1989). On the other hand, under a disparate impact theory of liability Plaintiffs need not prove that Defendant intentionally discriminated; rather, Plaintiffs need only show that Defendant's facially neutral actions adversely affected a group protected by Title VII. *See Int'l Bhd. of Teamsters*, 431 U.S. at 335 n.15. Because racial discrimination in violation of Title VII is by its nature class discrimination, Title VII claims are particularly suited to proceed as a class action. *Falcon*, 457 U.S. at 157. Nevertheless, the Supreme Court has repeatedly insisted that despite this obvious affinity, courts must rigorously enforce the prerequisites of Rule 23(a) before allowing a plaintiff's claim to proceed as a class action. *Id.* Thus, the determination of whether the action should proceed as a class requires this Court to answer "the substantive question whether, under either of the available theories, there exists the requisite 'pattern or practice' sufficiently and comparably affecting an identifiable class of protected employees." *See Stastny*, 628 F.2d at 274.

The representative plaintiffs allege that Elgin engaged in a pattern or practice of intentional discrimination against African American applicants, and therefore claim that Elgin violated Title VII under a disparate treatment theory of liability. Elgin urges this Court to decertify the class because the plaintiffs do not satisfy Rule 23(a)'s numerosity requirement for the class as a whole, and fail to establish a pattern or practice of discrimination and therefore cannot satisfy Rule 23(a)'s commonality, typicality, or adequacy of representation requirements.

Alternatively, Elgin argues that this Court should limit the class to those applicants who auditioned, in which case the modified class cannot satisfy the numerosity requirement.

### C. Prerequisites to Class Certification Under Rule 23(a)

Because Plaintiffs, in "seeking to maintain a class action under Title VII must meet 'the prerequisites of numerosity, commonality, typicality, and adequacy of representation' specified in Rule 23(a)," this Court will discuss each element in turn. *See Falcon*, 457 U.S. at 156 (quoting *Gen. Tel. Co. of the Northwest v. E.E.O.C.*, 446 U.S. 318, 330 (1980)).

#### 1. Numerosity

Rule 23(a)(1) requires that the class be so numerous to render joinder of all class members impracticable. "Impracticability does not mean impossibility, but instead requires plaintiffs to prove that it would be inconvenient and difficult to join all proposed members of the class." *Bethards v. Bard Access Sys., Inc.*, No. 94 C 1522, 1995 WL 75356, at *3 (N.D. Ill. Feb. 22, 1995). Although plaintiffs may not rely on conclusory allegations or on speculation regarding class size, they need not reach a threshold number of claims. *Allen v. City of Chicago*, 828 F. Supp. 543, 550 (N.D. Ill. 1993) (citations omitted). *See also, e.g. Gaspar v. Livantec Corp.*, 167 F.R.D. 51, 56 (N.D. Ill. 1996) (noting that a small class does not preclude certification because of failure to satisfy numerosity, and citing cases with similarly small classes). Indeed, courts need not consider solely the number of potential class members when evaluating whether a plaintiff satisfies the numerosity requirement. *Gaspar*, 167 F.R.D. at 56.

To determine whether joinder is impracticable courts must consider the circumstances

- 12 -

unique to each case. *Patrykus*, 121 F.R.D. at 361 (citing *Swanson v. Am. Consumer Indus.*, 415

F.2d 1326, 1333 (7th Cir. 1969)). Such circumstances include whether class members are able to

bring individual suits; whether it is judicially efficient for the court to try such individual suits;

and the geographical dispersion of class members. *Gaspar*, 167 F.R.D. at 56. For example, if

class members are dispersed across a vast geographic area, joinder is less practicable. *See e.g.*

*Betts v. Sundstrand Corp.*, No. 97 C 50188, 1999 WL 436579, at *5 (N.D. Ill. June 21, 1999)

(explaining that the "lack of geographic dispersion" of class members "weighs against" class

certification because joinder impracticability decreases where all class members can be found

within the same judicial district). Additionally, while injunctive and declaratory relief contribute

to satisfying numerosity, requests for monetary relief detract from a finding that plaintiffs satisfy

numerosity. *Id. See also Stambaugh v. Kan. Dep't of Corr.*, 151 F.R.D. 664, 673 (D. Kan. 1993)

(noting that courts consider "the inconvenience or inefficiency in trying individual suits, the

ability of class members to bring their own suits, the size of the individual claims, a request for

injunctive or declaratory relief, the nature of the relief sought, and the location and distribution of

class members" in evaluating numerosity).

Ellis contends that the plaintiffs satisfy the numerosity requirement because the class

presently contains sixty members and will increase while the class period remains open.

However, Elgin claims that seven putative class members must be excluded from the class

because they do not meet the class definition's requirements. Six members had no prior dealing

experience, and one of those six does not appear to be African American. A seventh putative

class member failed the casino's and the IGB's mandatory drug screening. Additionally, Ellis

claims that joinder is impracticable because twenty-three class members live outside Illinois,

while Elgin counters that joinder is in fact practicable because with few exceptions, the class members reside in the Chicago metropolitan area.

This Court finds that joinder is impracticable. The plaintiffs seek injunctive and declaratory relief, as well as back pay and therefore the relief sought neither favors nor disfavors a finding that the plaintiffs satisfy numerosity. However, even assuming that seven class members should be excluded for failure to meet the class requirements, thereby limiting the class to fifty-three members who are not geographically dispersed[12], joining such a large number of cases would unduly burden the court and defeat Rule 23's underlying purpose of promoting judicial efficiency and economy. Moreover, courts have held that smaller classes satisfy Rule 23(a)'s numerosity requirement. *See e.g. Riordan v. Smith Barney*, 113 F.R.D. 60, 62 (N.D. Ill. 1986) (compiling cases noting that classes of 10-40 members satisfy numerosity); *In re Bank One Sec. Litig.*, No. 00 CV 0767, 2002 WL 989454, at * 3 (N.D. Ill. May 14, 2002) (noting that "[c]ourts in this district have granted class certification to groups smaller than 30"). Therefore, because joinder is impracticable, the Court finds that the plaintiffs satisfy Rule 23(a)'s numerosity requirement.[13]

---

[12] Three of the sixty identified class members live a great distance from the Chicago metropolitan area (Shreveport, Louisiana; New Albany, Indiana; and Las Vegas, Nevada) and only two class members live more than one hundred miles from Chicago (Rock Island, Illinois and Saukville, Wisconsin). The remaining class members reside less than forty-five miles from Chicago. According to Elgin's list of class members, one class member's address is unidentified. (App. of Exs. in Supp. of Defs.' Mot. to Decertify the Class, Ex. N.)

[13] Elgin's alternative argument, that changing the class definition would defeat numerosity, does not need to be addressed, because as discussed below, Ellis fails to meet the other requirements of Rule 23(a).

## 2. Commonality

Turning to the next prerequisite for maintaining the class certification, Rule 23(a)(2) requires questions of law or fact common to the class. Factual variations among class members' grievances will not defeat commonality. *Keele*, 149 F.3d at 594. Therefore, the parties need not share a complete identity of factual or legal issues. *Riordan*, 113 F.R.D. at 63. Generally, "[a] common nucleus of operative fact is . . . enough to satisfy the commonality requirement of Rule 23(a)(2)." *Keele*, 149 F.3d at 594 (quoting *Rosario*, 963 F.2d at 1018). A common nucleus of operative fact is usually found where "the defendants have engaged in standardized conduct towards members of the proposed class . . . ." *Id.* Thus, racial discrimination in an employment context, arising out of the employer's standard operating procedure, is well-suited to class adjudication. *Falcon*, 457 U.S. at 157. However, the Supreme Court in *Falcon* explained that a party attempting to maintain a pattern or practice discrimination class action must demonstrate more than shared membership in a protected class, but must offer sufficient evidence to bridge the gap between his or her own individual claim and those of the class members who suffered the same injury. *Id.*

Elgin urges this Court to decertify the class because the plaintiffs have not established that Grand Victoria engaged in a pattern or practice of discriminatory hiring sufficient to satisfy Rule 23(a)'s commonality requirement. Elgin raises a two-pronged argument. First, it argues that Grand Victoria's decentralized hiring procedure necessitates an individualized inquiry into each decisionmaker's role in the decision not to hire each class member, thereby preventing the existence of an issue of fact common to each class member. Second, Elgin argues that each class

member possessed different qualifications (or a lack thereof), requiring a similar individualized inquiry for each class member and similarly precluding a common issue of fact for the class.

In response, Plaintiffs assert that the issue of law common to the class is the alleged pattern or practice of discrimination. Plaintiffs further assert that because this is a motion to decertify the class rather than a trial on the merits, they need not detail all of their evidence supporting their allegation that Elgin engaged in a pattern or practice of discriminatory hiring. Finally, Plaintiffs rely on Judge Gottschall's order certifying the class, which held that Plaintiffs' allegation that Elgin engaged in a pattern or practice of discrimination, if proven, satisfies the commonality requirement as a question of law or fact common to the entire class. However, because the parties must strictly adhere to Rule 23's requirements at all times, Plaintiffs bear the continued burden of producing a record to answer questions about whether the evidence justifies maintaining the class action. *See Stastny*, 628 F.2d at 277.

In a Title VII action, the commonality element is the "most critical" and one in which "the class action and merit inquiries essentially coincide." *Stastny*, 628 F.2d at 274. As the Supreme Court explained:

> Conceptually, there is a wide gap between (a) an individual's claim that he has been denied a [position] on discriminatory grounds, and his otherwise unsupported allegation that the company has a policy of discrimination and (b) the existence of a class of persons who have suffered the same injury as that individual, such that the individual's claim and the class claims will share common questions of law or fact and that the individual's claim will be typical of the class claims. For [plaintiffs] to bridge that gap, [they] must prove much more than the validity of [their] own claim[s].

*Falcon*, 457 U.S. at 157-58. To bridge the gap between Plaintiffs' individual claims and the claim that Elgin engaged in a pattern or practice of discrimination adversely affecting all class members, Plaintiffs must provide sufficient proof to "justif[y] a rebuttable inference" that Elgin's "'standard operating procedure'" proceeded from an intention to discriminate against the plaintiffs and class members based on their race. *See Stastny*, 628 F.2d at 273 (quoting *Int'l Bhd. of Teamsters*, 431 U.S. at 336).

Thus, the inquiry into whether the plaintiffs meet the commonality requirement (and to some extent the typicality and adequacy of representation requirements)[14] necessarily overlaps with the merits of the plaintiffs' claim that Elgin engaged in a pattern or practice of discrimination. The Seventh Circuit endorses such a limited inquiry into the merits and has explained that in determining whether a to certify a class, a court must "receive evidence" and resolve factual and legal disputes relative to whether the plaintiff meets Rule 23's requirements. *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001). After *Falcon*, a plaintiff must make "a specific showing of underlying facts which might raise an inference of a common question of pattern and practice through allegations of specific incidents of discrimination, supporting affidavits," or statistical evidence. Alba Conte & Herbert B. Newberg, Newberg on Class Actions §24:21 (4th Ed. 2002). Therefore, Plaintiffs must support their allegations of a pattern or practice of discrimination "with affidavits or other evidence, particularly statistics, [to]

---

[14] The *Falcon* court explained that the commonality and typicality elements tend to merge because both guide the court's determination of whether it is economical to maintain the class action and whether there exists a sufficient nexus between the plaintiff's claim and those of the class members such that the plaintiff will protect the class members' interests. The Court further explained that the requirements similarly merge with the adequacy of representation requirement. *Falcon*, 457 U.S. at 158 n.13.

raise an inference of across-the-board discrimination." *See Ploog v. Homeside Lending, Inc.,* 2001 WL 987889, at *7 (N.D. Ill. 2001) (citing *Falcon*, 457 U.S. at 159 n.15). *See also Abram v. United Parcel Serv. of Am., Inc.,* 200 F.R.D. 424, 428-33 (E.D. Wis. 2001); *Zapata v. IBP, Inc.,* 167 F.R.D. 147, 158-59 (D. Kan. 1996); *De La Fuente v. Chi. Tribune Co.,* No. 84 C 4596, 1985 WL 2103, at *2-8 (N.D. Ill. July 24, 1985).

### a.    Decentralized Hiring

Thus it is appropriate for this Court to analyze the evidence the parties provide with respect to the alleged discriminatory hiring pattern or practice. Commonality is relatively easily satisfied when a single individual or a small, centralized group makes decisions. *Abram*, 200 F.R.D. at 432 (citing *Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590, 598 (2d Cir. 1986)). For example, the Second Circuit in *Rossini* explained that plaintiffs in a sex discrimination class action sufficiently alleged that the defendant discriminated against them when a small, central group of decisionmakers assigned the plaintiffs "to departments or tasks within departments dealing with what was viewed by the assigning officials as 'women's work.'" 798 F.2d at 599. The court held that the plaintiffs satisfied Rule 23(a)'s commonality requirement because "[c]ommon issues of law and fact would necessarily be involved in proving the existence and functioning of that system." *Id.*

On the other hand, a decentralized hiring procedure, which allows decisionmakers to consider subjective factors, supports individual claims of discrimination but cuts against the assertion that an employer engages in a pattern or practice of discriminatory hiring as a standard operating procedure. *Stastny*, 628 F.2d at 279. Therefore, "the question is whether the decision

making processes within [Grand Victoria] permit a common pattern or practice of discrimination to occur therein." *See Rosenberg v. Univ. of Cincinnati*, 654 F. Supp. 774, 778 (S.D. Ohio 1986). In order to permit such a pattern or practice, the decisionmaking must be sufficiently centralized and the decisions themselves must be sufficiently objective to form part of the company's standard operating procedure. For example, in *Rosenberg* the court held that a university's decisionmaking process was too decentralized for discriminatory decisions to be part of a pattern or practice of discrimination because each department established its own policies, and thus the plaintiffs alleging that the university engaged in discriminatory employment practices could not establish commonality and maintain their class action. *Id.* at 780. In *Rosenberg*, the plaintiffs presented affidavits detailing their individual experiences and allegations of discrimination, along with a statistical analysis, university regulations, affirmative action policy statements, and letters and memos relevant to one plaintiff's claim. *Id.* at 779-80. The court held that, even accepting all of the plaintiffs' allegations as true, "nothing in [the] evidence tend[ed] to show that [the] violations [arose] out of a common pattern or practice based upon centralized decision-making . . . ." *Id.* at 780.

Similarly, in *Stastny*, the court held that the plaintiffs offered insufficient evidence to justify an inference that the employer engaged in a pattern or practice of decisionmaking sufficient to establish the existence of a common question of law or fact. *Stastny*, 628 F.2d at 280. The plaintiffs alleged that the defendant employer discriminated on the basis of sex. *Id.* at 270. The case proceeded to trial, during which the named plaintiffs offered their own testimony as well as testimony by a former general manager from the defendant's North Carolina facility, regarding the company's employment practices. *Id.* In addition, the plaintiff offered statistical

- 19 -

evidence and the opinion of a statistical expert, suggesting that a disproportionately low number of female employees occupied management positions. *Id.* The defendant appealed the district court's finding that the defendant engaged in a pattern or practice of discrimination, arguing that the plaintiffs failed to satisfy the requirements of Rule 23(a) and (b). *Id.* at 272. The Fourth Circuit reversed, holding that the plaintiffs failed to meet those requirements. *Id.* at 272-73. The court explained that the plaintiffs could have offered sufficient evidence of a pattern or practice of discrimination common to a multi-facility employer in one of three ways: first, they could have offered "evidence of a sufficient number of instances of similar discriminatory treatment experienced by individuals throughout a multi-facility enterprise." *Id.* at 278. Second, the plaintiffs could have offered statistical data to justify the inference. *Id.* Third, the plaintiffs could have offered direct evidence or an admission by the defendant that it intentionally engaged in a system-wide practice of discrimination. *Id.* The court held that the plaintiffs' evidence, which indicated "almost complete local autonomy in the local facilities," failed to overcome the presumption against commonality by any of these methods. *Id.*

Ellis similarly fails to establish commonality. Before turning to the plaintiffs' evidence, however, it is helpful to outline the evidence Elgin provides in support of its motion to decertify the class. Elgin submitted numerous affidavits and excerpts from depositions, including the affidavits of Human Resources Manager Sharon McGill, Casino Manager Michael Graninger, and Shift Manager Julian Thompson. These affidavits support Elgin's assertions that hiring decisions are made through three levels and by various individuals at each level: first, Human Resources, then Graninger, then Thompson or another shift manager responsible for auditioning applicants. At the Human Resources level, three managers have been responsible for initial

applicant screening during the class period. Human Resources uses some standardized procedures, such as reviewing each application for overall completeness and job history, including previous employment with Grand Victoria. In addition, each Human Resources manager focused on particular factors which she deemed important: Lennor Penson focused on verifying prior employment and eligibility for rehire, while Zaara Norten focuses on job stability. Although McGill oversees the hiring of all new employees, she gives assistant managers full authority to make screening decisions.

Following initial screening, Casino Manager Michael Graninger and Pit Manager Julian Thompson similarly consider both objective and subjective factors while screening applications. Graninger's affidavit explains that he generally reviews applications for such objective considerations as which applicants have two to three years of experience, which applicants have a stable job history, and which applicants have previously worked for Grand Victoria and the reasons they left the casino's employ. According to Thompson, he and Graninger frequently reviewed the applications together, and if the applicant noted that a friend or relative worked at the casino, they often spoke with the friend or relative to verify subjective considerations including the applicant's skill, work ethic and trustworthiness.

Following this second level of screening, Graninger instructed shift managers or pit managers to invite a group of applicants to audition. At least seven individuals conducted auditions over the course of the class period, objectively testing the applicants' knowledge of the game, procedures, and payoffs for which they auditioned, as well as the applicant's neatness and accuracy in shuffling. However, auditioners also considered inherently subjective factors: the applicant's awareness of all players and occurrences at the gaming table and, particularly, the

applicant's ability to interact well with others. Each auditioner's assessment of an applicant necessarily varied with these subjective considerations.

Ellis does not contradict Elgin's assertion that it uses decentralized hiring procedures, and considers objective and subjective factors. Instead, the named plaintiffs assert that their allegation that Elgin engaged in a pattern or practice of discrimination is sufficient to establish commonality. Ellis' main argument is that Elgin knew applicants' race and that many of its hiring procedures constituted a standardized policy of discrimination: 1) Human Resources used a Pre-Employment Screening Tool for those applicants who chose to apply in person; 2) Graninger and other decisionmakers inquired about applicants' skill; 3) Elgin provided an incentive program for employees to refer friends and relatives for dealer positions and offered a training program for current employees; 4) Elgin hired dealers from Hollywood Casino; and 5) Graninger restricts the applicant pool by changing the advertised hiring criteria based on his needs. However, these procedures are facially neutral and Ellis provides no anecdotal evidence to support an inference that the practices are part of a standardized pattern or practice of discriminatory hiring. Ellis also alleges that Elgin prefers Asian dealers because, after Mr. Thompson auditioned two Vietnamese women in Davenport, Iowa, Elgin advertised for dealers in the Iowa newspapers. Consequently, Elgin hired many Asians. However, the alleged "Asian preference" does not, standing alone or in connection with the aforementioned procedures, form the basis of a pattern or practice of discrimination.

Similarly, Ellis provides no significant statistical evidence that would justify an inference that a pattern or practice exists to unite plaintiffs' claims with those of the class. *See Stastny*, 628 F.2d at 278 (noting that where putative class members were widely dispersed and worked in

different facilities, statistical evidence of "comparable disparities in treatment" by the different facilities would have helped to justify an inference that it reflected a system-wide policy or practice, thereby establishing commonality); *Bishop v. N.Y. City Dept. of Hous. Pres. & Dev.*, 141 F.R.D. 229, 237 (S.D.N.Y. 1992) (finding that plaintiff's statistics supported their commonality claim). First, Ellis offers no statistical evidence to justify an inference that Elgin's advertisement in Davenport, Iowa newspapers was part of a pattern or practice of discriminatory hiring. For example, among other statistically important information, Ellis fails to mention the racial composition of Davenport, fails to mention whether any African American dealers from Davenport applied and were granted or denied an audition or a dealer position, and fails to mention how many Asians from Davenport (or Chicago) applied and were granted or denied an audition or dealer position.

Second, Ellis offers a portion of McGill's deposition to establish that between 2000 and 2002, forty-five individuals where hired through the Bring-a-Friend program, and that a number of the referrals and hires were of the same race (e.g. Asian-Asian, Caucasian-Caucasian). However, while this might establish that persons of one race tended to refer individuals of the same race (a doubtful conclusion at best), it fails to establish that the mere existence of a referral program is part of a pattern or practice of discrimination. The Bring-A-Friend program was open to all Grand Victoria employees, and the fact that employees of one race took advantage of the program, and perhaps tended to refer persons of the same race more than others, cannot be attributed to any intent to discriminate on the part of Elgin.

Third, Ellis' reliance on statistics to establish that the In-House Dealer Training Program is a part of the pattern or practice of discrimination is similarly flawed. Ellis argues, without

- 23 -

citing any portion of the record, that employees can only gain admission to the program upon referral by their managers.[15] Accepting Ellis' allegation as true, a requirement that individual managers refer employees is evidence of decentralized decisionmaking within Grand Victoria rather than of a pattern or practice of discrimination. Ellis further argues that between 1998 and 2002, of eighty-four employees transferred to dealer positions, only four were African American. However, Ellis fails to provide any information defining how many African American employees sought admission but were refused a referral, or how many successful African American candidates completed the program but were not hired as dealers. Standing alone, those numbers are not statistically useful and do not justify an inference that the training program constitutes part of a pattern or practice of discrimination.

Finally, Ellis offered no direct evidence or admission by Elgin that it engaged in a pattern or practice of discriminatory decisionmaking. Thus, the evidence that Ellis provided neither contradicts the strong suggestion that Elgin's decisionmaking methods are highly decentralized and subjective, nor justifies an inference that Elgin engaged in a pattern or practice of discriminatory hiring despite its lack of a centralized hiring system. Decisions on each applicant were therefore made as a result of a decentralized decision making procedure considering both objective and subjective factors, and while each Plaintiff might have an individual claim of discrimination, the plaintiffs have not established a pattern or practice of discrimination common to the class sufficient to satisfy Rule 23(a)'s commonality requirement.

---

[15] Elgin disputes this allegation, claiming that employees can sign up for the training program as long as a) the employee has been employed at Grand Victoria for three months and b) does not have too many disciplinary infractions. (Gilmore Dep. at 18, 23-25.) Employees admitted to the program learn "21," and if hired for "21," may train on all other games. (Gilmore Dep. at 24.)

b.    Individualized Proof

Another factor this Court considers in determining whether Plaintiffs satisfy commonality is the diversity or uniformity of the class. *Abram*, 200 F.R.D. at 432. Discrimination based solely on membership in a protected class, "which manifests itself in a different set of facts for each employee is not enough to satisfy the commonality requirement." *Id.* (quoting *Harris v. City of Chicago*, No. 96 CV 3406, 1998 WL 59873, at *5 (N.D. Ill. Feb. 9, 1998)). Similarly, a lack of uniformity in conditions throughout the class period detracts from finding that the plaintiffs satisfy the commonality requirement. *Id.* at 430-32.

Judge Gottschall rejected Elgin's reliance on *Patterson v. General Motors Corp.*, 631 F.2d 476 (7th Cir. 1980), for the proposition that the individualized nature of the proof of each class member's claim defeated commonality, holding instead that the alleged pattern or practice united the named plaintiffs' claims with those of the class members. However, as explained above, the evidence reveals a decentralized and subjective hiring practice, which precludes a finding that Elgin engaged in a pattern or practice of discrimination. Although the fact that Elgin used a decentralized hiring system is not new to this litigation, Plaintiffs bear the burden of establishing that, despite the decentralized hiring system, Elgin engaged in a pattern or practice of discrimination. Plaintiffs fail to do so, and absent such a showing, the evidence does not yield any additional uniting question of law or fact to satisfy the commonality requirement. Plaintiffs offer no alternative common question, nor do the affidavits or depositions yield an alternative. To the contrary, the evidence establishes that the applicants had varying levels of experience with various games, and that the applicants applied at different times over the course of the class period, during which the casino's hiring needs fluctuated greatly. For example, the casino needed

- 25 -

many more dealers in June and August 1999 when it instituted dockside gambling and changed

its shift schedules, while in January 2001 and in August 2002 the casino laid off a number of

dealers.

Elgin also contends that because the plaintiffs seek back pay damages, requiring the court

to inquire into each "person's employment history, subsequent earnings and efforts to mitigate"

precludes a finding of commonality. (Defs.' Mem. at 17.) However, despite the individualized

nature of such an inquiry, damage awards commonly vary among class members. *See, e.g. De La*

*Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 233 (7th Cir. 1983). Courts commonly

bifurcate "employment discrimination trials into liability and damages proceedings." Newberg,

*supra* at §24:24.

The plaintiffs rely on *Mejdrech v. Met-Coil Systems Corp.*, 319 F.3d 910 (7th Cir. 2003),

to argue that an individualized inquiry into the applicants' qualifications and the different

conditions throughout the class period will not defeat commonality in a pattern or practice

discrimination case. However, in *Mejdrech* the court addressed a mass tort case rather than a

Title VII case, and held that the common questions of whether the defendant leaked TCE, and if

so, whether that TCE had reached the soil and ground water under the class members' homes

united the claims of the named plaintiffs and class members. *Id.* at 911. The individual inquiries

required to resolve the defendant's liability to each class member were minor, with the only

variables being the location of each plaintiff's home and water source. *Id.* at 911-12.

Conversely, in the case at bar the court must consider numerous variables to resolve each class

member's claim thus defeating the essential purpose and benefits of proceeding as a class.

Moreover, although Plaintiffs correctly state that a pattern or practice discrimination case

- 26 -

inherently involves class discrimination, their argument fails to acknowledge the Supreme

Court's admonishment that even Title VII claimants must satisfy each element of Rule 23(a)

before proceeding or continuing as a class action. *See Falcon*, 457 U.S. at 156-57. Therefore,

because Elgin's hiring procedures are decentralized and allow decisionmakers to proceed

autonomously, and to consider both objective and subjective factors in screening and auditioning

applicants, the plaintiffs have not established that Elgin engaged in a pattern or practice of

discrimination sufficient to bridge the gap between their claims and those of the class. Further,

the plaintiffs fail to offer any additional evidence to suggest an alternative common question of

law or fact and therefore cannot satisfy the commonality requirement of Rule 23(a). Absent any

central, objective decisionmaking, and absent any anecdotal or statistical evidence to justify an

inference that despite facially neutral procedures Elgin engaged in a standardized, discriminatory

course of conduct, the plaintiffs have not demonstrated that a common question of law or fact

exists to unite their claims with those of the entire class.


### 3. Typicality

Likewise, Plaintiffs have failed to establish that the claims of the class representatives are

typical of the claims or defenses of the class. See Fed. R. Civ. P. 23(a)(3). The inquiry into

whether Ellis' "claims are typical of those of the class members [they represent] is closely related

to the commonality inquiry." *See Keele*, 149 F.3d at 595 (citing *Rosario*, 963 F.2d at 1018). As

the *Stambaugh* court explained:

> For their claims to be typical, the plaintiffs [in a pattern and
> practice discrimination class action] must show an aggrieved class
> to exist. For their claims to be typical, the plaintiffs must show the

> same unlawful conduct was directed at or affected the class. For
> their claims to be typical, the plaintiffs must present some evidence
> from which to infer that the selection process . . . is uniformly
> administered . . . .

*Stambaugh*, 151 F.R.D. at 677. Thus, "[a] 'plaintiff's claim is typical if it arises from the same

event or practice or course of conduct that gives rise to the claims of other class members and his

or her claims are based on the same legal theory.'" *Keele*, 149 F.3d at 595 (quoting *De La Fuente*

*v. Stokely-Van Camp*, 713 F.2d at 232). Although factual variations in claims will not destroy

typicality, even those claims "based on the same legal theory, must all contain a common 'core of

allegation.'" *Allen*, 828 F. Supp. at 553 (quoting *Riordan*, 113 F.R.D. at 63). In other words, the

named representatives' claims must "have the same essential characteristics as the claims of the

class at large." *Retired Chi. Police Ass'n I*, 7 F.3d at 597.

This Court determines whether typicality is satisfied "with reference to [Elgin]'s actions,

not with respect to particularized defenses it might have against certain class members." *See*

*Wagner v. NutraSweet Co.*, 95 F.3d 527, 534 (7th Cir. 1996) (citing *Rosario*, 963 F.2d at 1018).

However, a unique defense will destroy typicality if it will "consume the merits of the case."

*Gaspar*, 167 F.R.D. at 57 (citing *Riordan*, 113 F.R.D. at 62). Those unique defenses consuming

the merits destroy typicality because they eliminate a primary purpose of a class action: to allow

the named plaintiffs to "establish the bulk of the elements of each class member's claims when

they prove their own." *Retired Police Ass'n v. City of Chicago*, 141 F.R.D. 477, 485 (N.D. Ill.

1992) (citing *Brooks v. S. Bell Tel. & Tel. Co.*, 133 F.R.D. 54, 58 (S.D. Fla. 1990)), *aff'd in*

*pertinent part, rev'd in part, Retired Police Ass'n I*, 7 F.3d at 597-98.

Ellis contends that Judge Gottschall "unconditionally and unequivocally concluded" that

the named plaintiffs satisfied Rule 23(a)'s typicality requirement. However, as explained previously, every aspect of a court's certification order is necessarily conditional because of the court's obligation to modify or decertify the class if the course of litigation reveals that certification is no longer proper. *Falcon*, 457 U.S. at 160; *Binion*, 163 F.R.D. at 520.

Elgin argues plaintiffs' claims are atypical of the class members' claims, because 1) two named plaintiffs were auditioned and two were not; 2) each applicant had unique qualifications; and 3) two named plaintiffs are subject to unique defenses not applicable to other class members. Elgin also argues that when class representatives Ellis and Denson filed an additional lawsuit against Elgin[16], alleging that Elgin retaliated against them for the instant action by prohibiting their entry to the Grand Victoria Casino during the pendency of this litigation and for 120 days following its conclusion, they further eroded typicality between their claims and those of the class members. (Defs.' Supp'l Submission in Support of Mot. to Decertify.)

Although Ellis relies on a single legal theory (the alleged pattern and practice of discriminatory hiring), as explained above in the discussion of Rule 23's commonality requirement, Ellis has failed to establish a standard operating procedure rising to the level of a pattern or practice of discriminatory hiring, and likewise fails to establish a common core of allegation to satisfy the typicality requirement. Plaintiffs offer no additional evidence, either anecdotal or statistical, to establish that their claims are typical of those of the class. Nor do Plaintiffs dispute that, beyond the alleged pattern and practice of discrimination, the circumstances of each applicant are unique and require consideration of numerous individualized

---

[16] *Denson & Ellis v. Elgin Riverboat Resort, Nevada Landing Partnership & RBG, L.P.*, Case No. 03 C 3402, filed on May 21, 2003, in the Northern District of Illinois.

factors. For example, individual class members would have to establish their qualifications for a dealer position, the circumstances of their application and, where appropriate, their audition. Such proof would require an inquiry into how far the class member's application proceeded, as well as which employees reviewed the application. For those applicants who auditioned, a further individualized inquiry would entail consideration of which shift manager or pit manager conducted the audition. Finally, proof of auditioning class members' claims would require consideration of the manager's objective assessment of the applicant's neatness and accuracy, and knowledge of the game, procedures and payoffs, as well as his or her subjective assessment of the applicant's awareness of players at the gaming table and ability to interact with customers. Absent a common core of allegation, such individualized inquiries defeat the purpose of a class action.

Finally, Ellis does not dispute the defenses unique to Ellis and English: Ellis was previously employed by the casino and did not receive an invitation to audition, while English sought part-time employment and was a frequent customer at Grand Victoria. Such unique defenses render their claims atypical of those of the rest of the class. *Cf. J.H. Cohn & Co. v. Am. Appraisal Assocs., Inc.*, 628 F.2d 994, 998-99 (7th Cir. 1980) (noting that an "arguable defense peculiar to the named plaintiff . . . may destroy the required typicality of the class"); *Bishop*, 141 F.R.D. at 239 (finding a named plaintiff atypical where the defendants would likely raise a defense unique to that plaintiff). Therefore, because proof of each class members' claim would require a fact-intensive, individualized inquiry into the circumstances surrounding the decision not to audition or to hire that applicant, and because Defendants will raise defenses unique to two named plaintiffs, this Court finds that the named Plaintiffs' claims are not typical of those of the

class. The Court agrees with Defendants that the named plaintiffs and class members have instead only identified "idiosyncratic circumstances of his or her own application and its rejection by Grand Victoria." (Defs.' Mem. at 12.)


### 4. Adequacy of Representation

Finally, Rule 23(a) requires Plaintiffs to demonstrate that they adequately represent the interests of the class as a whole. Fed. R. Civ. P. 23(a)(4). In order to satisfy this requirement, Ellis must establish both 1) the adequacy of named plaintiffs' counsel, and 2) the adequacy of the named plaintiffs' representation in "'protecting the different, separate, and distinct interest' of the class members." *Retired Police Ass'n I*, 7 F.3d at 598 (quoting *Sec'y of Labor v. Fitzsimmons*, 805 F.2d 682, 697 (7th Cir. 1986)). Thus, just as the inquiry into commonality and typicality are linked, so too are the inquiries into typicality and adequacy of representation, because "[t]ypicality insures the class representative's claims resemble the class's claims to an extent that an adequate representation can be expected." *Stambaugh*, 151 F.R.D. at 676 (citing 7A Charles A. Wright, *Federal Practice & Procedure* §1764 at 232-33 (2d ed. 1986)). If the representative and the class members have "antagonistic or conflicting claims," the "class is not fairly and adequately represented." *Id.* (quoting *Rosario*, 963 F.2d at 1018); *but see Orlowski v. Dominick's Finer Foods, Inc.*, 172 F.R.D. 370, 374 (N.D. Ill. 1997) (holding that, despite the defendant's argument that class members competed for a limited number of promotion opportunities, the named plaintiffs would adequately represent the class). Further, just as the presence of an arguably unique defense may destroy typicality, so too can "the presence of even an arguable defense against the named plaintiff that is not applicable to the proposed class . . .

- 31 -

can vitiate the adequacy of named plaintiff's representation." *Hardin v. Harshbarger*, 814 F. Supp. 703, 708 (N.D. Ill. 1993).

Plaintiffs again rely on the unconditional nature of Judge Gottschall's certification with respect to their adequacy of representation. However, as explained previously, every aspect of a court's certification order is necessarily conditional because of the court's obligation to modify or decertify the class if the course of litigation reveals that certification is no longer proper. *Binion*, 163 F.3d at 520. Given the five-year class period, class members very likely competed against each other for dealer positions at the casino, presenting antagonistic and conflicting claims within the class. Additionally, as previously explained, Elgin offers defenses unique to Ellis and English. These unique defenses will distract Ellis and English from adequately representing the interests of the class. This distraction, combined with Plaintiffs' and class members' unique qualifications and the casino's varied hiring needs at the time of each class member applied, make it unlikely that Plaintiffs will be able to adequately represent the class as a whole. Therefore this Court finds that Plaintiffs also fail to satisfy Rule 23(a)(4)'s requirement that Plaintiffs will adequately represent the class.

### D.    Certification Under Rule 23(b)(2)

Elgin also contends that Judge Gottschall improperly certified the class under Rule 23(b)(2) because Plaintiffs and class members seek monetary damages, relying on the Seventh Circuit's holding that, where money damages are incidental, certification under Rule 23(b)(2) is improper. *Lemon v. Int'l Union of Operating Eng'rs, Local No. 139*, 216 F.3d 577, 579 (7th Cir. 2000). However, in *Lemon* the court discussed the certification options presented when plaintiffs

- 32 -

seek declaratory and injunctive relief as well as monetary damages, relying on its recent decision in *Jefferson v. Ingersoll Int'l, Inc.*, 195 F.3d 894 (7th Cir. 1999). The Seventh Circuit held that a court may certify such a case in one of three ways, including certifying the class under Rule 23(b)(2) while "exercis[ing] its plenary authority under Rules 23(d)(2) and 23(d)(5) to provide all class members with personal notice and opportunity to opt out, as though the class was certified under Rule 23(b)(3)." *Lemon*, 216 F.3d at 582 (citing *Jefferson*, 195 F.3d at 898). However, because this Court finds that Plaintiffs fail to establish Rule 23(a)'s requirements to maintain a class action, we do not need to reach the issue of whether the requirements of Rule 23(b)(2) are met.

## IV. Conclusion

For the foregoing reasons, and because Plaintiffs have not demonstrated that a common question of law or fact exists, that their claims are typical of those of the class, or that they can adequately represent the class, this Court grants Defendants' motion to decertify the class. Defendants' motion to amend the class definition to include only those applicants who auditioned is denied as moot.

**ENTER ORDER:**

**MARTIN C. ASHMAN**
Dated: August 21, 2003.      United States Magistrate Judge

- 33 -

Copies have been mailed to:

CECILE SINGER, Esq.                     JANE M. McFETRIDGE, Esq.
KENNETH N. FLAXMAN, Esq.                JOEL W. RICE, Esq.
200 South Michigan Avenue               Fisher & Phillips, L.L.P.
Suite 1240                              140 South Dearborn Street
Chicago, IL  60604                      Suite 420
                                        Chicago, IL  60603


Attorneys for Plaintiffs                Attorneys for Defendants